NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **Hon. Dennis M. Cavanaugh** |
| Plaintiff, | **OPINION** |
| v. | Civil Action No. 00-cv-3174 (DMC) |
| LANE LABS-USA, INC., CARTILAGE CONSULTANTS, INC., corporations, and I. WILLIAM LANE and ANDREW J. LANE, individuals, | |
| Defendants. | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court on remand for reconsideration of Plaintiff's motion for a finding that Defendants are in violation of orders agreed to by the parties and entered by the Honoral William G. Bassler, U.S.D.J. on June 30, 2000 (the "Final Order") (ECF No. 3). After carefully considering the complete record, and based upon the factual findings below, the Court concludes that Plaintiff has sustained its burden of proof. Accordingly, Plaintiff's motion is granted.

I.   BACKGROUND

This case concerns a contempt motion arising out of dietary supplement marketing claims. Plaintiff is the Federal Trade Commission ("FTC"). Defendants are Lane Labs-USA, Inc., ("Lane Labs") and Andrew Lane (collectively, "Defendants").[1] The underlying facts of this case are set

---

[1] Dr. William Lane, originally a defendant in this action, passed away on April 29, 2011.

forth more fully in FTC v. Lane Labs-USA, Inc., 624 F.3d 575 (3d Cir. 2010), and will not be repeated here except as required to set a foundation for the questions presently before this Court.

Lane Labs, founded in 1994 by Andrew Lane, is a supplier of dietary supplements. In June of 2000, the FTC charged Defendants with deceptive acts in violation of § 5 of the Federal Trade Commission Act (the "FTC Act"). Lane Labs, 624 F.3d at 578. During the litigation, Defendants agreed to the terms of a consent decree, which was entered by the District Court as the Final Order, imposing a permanent injunction. Id. As was the case before this Court in August of 2009, and before the Third Circuit in October 2010, two provisions of the Final Order are currently at issue: Section III and Section IV.

Section III of the Final Order requires Defendants, in making claims about the health benefits of a product, to possess competent and reliable scientific evidence that substantiates their claims. Section IV of the Final Order bars Defendants from misrepresenting "the existence, contents, validity, results, conclusions, or interpretations of any test, study or research."

On January 12, 2007, the FTC filed a motion with this Court to hold the Defendants in contempt for violating Sections III and IV of the Final Order. FTC v. Lane Labs-USA, Inc., No. 00-3174, 2009 U.S. Dist. LEXIS 70146 at *3 (D.N.J. August 11, 2009) (DMC). Following a five day evidentiary hearing, this Court denied the FTC's motion for contempt. Id. at *29. This Court based its opinion in large part on the relative credibility of the parties' expert witnesses, and on the reasonableness of the defense witnesses' approach to the subject matter in light of the Final Order's requirements. Id. at *21-25. This Court was also seriously concerned with issues of fundamental fairness, and found that the FTC's failure to timely consider compliance reports filed by Defendants, along with facts presented at the hearing, suggested that Defendants took all reasonable steps to

substantially comply with the Final Order.

On October 26, 2010, the Third Circuit reversed and remanded for reconsideration. Lane Labs, 624 F.3d at 592. Specifically, the Third Circuit has directed this Court to reconsider whether Defendants' marketing claim that their calcium supplement "AdvaCal" is three to four times more absorbable than other calcium supplements violated Section III of the Final Order, and whether Defendants distorted research regarding AdvaCal in violation of Section IV of the Final Order. Id. at 586-89. Additionally, the Third Circuit has directed this Court to reconsider, in light of its formal adoption of the defense of "substantial compliance," whether Defendants substantially complied with the Final Order. Id. at 592.

On November 1, 2010, this Court asked the parties to submit proposed findings of fact addressing only (1) whether the claim that AdvaCal is three to four times more absorbable than other calcium supplements promised results unattainable for large segments of Defendants' audience, and whether AdvaCal was marketed to elderly women at risk of, or suffering from, achlorydria; (2) whether Defendants distorted research regarding AdvaCal such that express or implied misrepresentations were made regarding "the existence, contents, validity, results, conclusions, or interpretations of any test, study or research" pertaining to "the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any food, dietary supplement, or drug;" and (3) the extent to which any violations of the Final Order were "technical" or "inadvertent," thereby justifying a defense of substantial compliance. (Letter Order, ECF No. 127). On December 15, 2010, the parties submitted their respective Proposed Findings of Fact. (ECF No. 131, 132, 133). On December 28, 2010, Defendants filed a letter objecting to certain of the FTC's Proposed Findings of Fact. (ECF No. 134). On January 4, 2011, the FTC responded to Defendants objections, and

noted their own objections to Defendants' Proposed Findings of Fact. (ECF No. 135). The matter is now, once again, before this Court.

II.     STANDARD OF REVIEW

A.  Civil Contempt

"The exercise of the power to find and to punish for contempt is . . . discretionary, and should be undertaken with the utmost sense of responsibility and circumspection." Thompson v. Johnson, 410 F. Supp. 633, 640 (E.D. Pa. 1976), aff'd 556 F.2d 568 (3d Cir. 1977). For a party to be held in civil contempt, a plaintiff must show that "(1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order." John T. ex rel. Paul T. v. Delaware County Intermediate Unit, 318 F.3d 545, 552 (3d Cir. 2003) (quoting Harris v. City of Philadelphia, 47 F.3d 1342, 1349 (3d Cir. 1995)). The burden then shifts to the alleged contemnors to show why they were unable to comply with the order. FTC v. Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir. 1999), cert. denied sub nom Lawson v. FTC, 534 U.S. 1042 (2001); In re Affairs with a Flair, 123 B.R. 724, 727 (Bankr. E.D. Pa. 1991).

To establish contempt, the movant bears the burden of proving by clear and convincing evidence that the respondent violated a court order. Roe v. Operation Rescue, 54 F.3d 133, 137 (3d Cir. 1995). This standard is not satisfied unless the evidence "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [a court] to come to a clear conviction without hesitancy, of the truth of the precise facts." U.S. v. Askar, 222 Fed. Appx. 115, 119 (3d Cir. 2007) (quoting In re Jobes, 108 N.J. 394, 529 A.2d 434 (1987)). Where there is any reason to doubt

the wrongfulness of the respondents' conduct, a court should not find contempt. John T., 318 F.3d at 552. Willfulness is not an element of contempt, nor does evidence of good faith bar a conclusion that a defendant acted in contempt. Robin Woods, Inc. v. Woods, 28 F.3d 396, 399 (3d Cir. 1994).

While good faith is not a defense to the elements of contempt, it is a factor in determining the availability of the affirmative defense of substantial compliance. Lane Labs, 624 F.3d at 591. "In order to avail oneself of the defense, a party must show that it (1) has taken all reasonable steps to comply with the valid court order, and (2) has violated the order in a manner that is merely 'technical' or 'inadvertent.'" Id.

III.   DISCUSSION

The issues presented on remand are essentially the same as in this Court's initial consideration of the matter. The first two elements of civil contempt are uncontested. Therefore, the third element, whether the Defendants disobeyed Sections III or IV of the Final Order, and the defense of substantial compliance, are the dispositive issues in this case.

A.  Section III

The Third Circuit questioned the "incongruity" between Defendants' assertion that AdvaCal was marketed to elderly women at risk of achlorhydria, and the actual language of the challenged representations which "do not, on their face, limit their claims to any particular target group." Id. at 585-86. The first task for this Court, therefore, is to determine "whether AdvaCal was, as a matter of fact, marketed to elderly females at risk of, or suffering from, achlorhydria." Id. at 586.

Defendants argue that the evidence and testimony presented at the hearing indicate that

AdvaCal was primarily marketed to post-menopausal women at risk of, or suffering from, achlorhydria.[2] (Defs. Andrew Lane and Lane Labs' Proposed Findings of Fact at 4-6) ("Defs.' Proposed Findings") (ECF No. 132). Defendants further argue that the evidence demonstrates that AdvaCal is in fact three to four times more absorbable than other calcium supplements for post-menopausal women at risk of, or suffering from, achlorhydria. (Defs.' Proposed Findings at 9-10). Defendants therefore argue that they did not promise results that were unattainable for large segments of their audience. (Defs.' Proposed Findings at 10). For this reason, Defendants argue that they did not violate Section III of the Final Order, because they possessed competent and reliable scientific evidence that substantiates their claim that AdvaCal was three to four times more absorbable than other calcium supplements. (Defs.' Proposed Findings at 10).

The FTC draws a different conclusion from the evidence, arguing that Defendants marketed AdvaCal not only to elderly achlorhydric women, but to men and women of all ages as well. (FTC's Proposed Findings of Fact at 1) ("FTC's Proposed Findings") (ECF No. 133). Further, the FTC argues that Defendants' claim that "AdvaCal is three to four times more absorbable than other calcium supplements" is not obtainable in any population, young or old. (FTC's Proposed Findings at 13). For these reasons, the FTC contends that Defendants promised results that were not attainable in any population, which shows that Defendants did not possess competent and reliable scientific evidence for their claims, in violation of Section III of the Final Order. (FTC's Proposed Findings at 1).

In support of their contention that Defendants marketed AdvaCal to a broad population, the

---

[2] Achlorhydric individuals cannot produce stomach acid and, as a result, absorb calcium at a rate significantly below average. FTC, 624 F.3d at 585.

FTC directs the Court's attention to Defendants' advertising material, including an infomercial, Lane Labs' catalogue, a letter to consumers, the Lane Labs website, direct mailings, a Health Sciences Institute newsletter, communications to retailers, telemarketing scripts, marketing plans, mailing lists, and outside publications. (FTC's Proposed Findings at 1-13). A thorough review of the most prominent of these materials indicates that Lane Labs marketed AdvaCal to men and women of all ages.

As part of their AdvaCal advertising campaign, Defendants produced an infomercial starring Dr. William Lane. (FTC.'s Ex. 537). Between March 2003 and February 2004, this infomercial was broadcast on television 177 times. (Stipulations of Fact ¶¶ 4(f), 9) (ECF No. 112). Defendants also distributed 10,000 CD Roms containing the infomercial. (Stipulations of Fact ¶ 8). This infomercial highlights the dangers of calcium deficiency, notes the importance of "taking action" at an early age, and features testimonials from men and women of all ages, including some in their twenties and thirties. Throughout the infomercial, various doctors, scientists, advocates and consumers proclaim the benefits of AdvaCal. Specifically, the infomercial touts AdvaCal's quality as "the most highly absorbable form of calcium," and states that AdvaCal "has been shown to be three times easier to absorb than ordinary chalky calcium." (FTC's Ex. 537 at 6). The participants, context, and language of the infomercial plainly indicates an effort by Lane Labs to market AdvaCal to men and women of all ages. Defendants argue that this infomercial was a failed test, and only generated $20,000 in sales before being quickly discontinued. (Defs.' Proposed Findings 7 n.2; Tr. 924, 1052). The relative success of the infomercial does not, however, alter the breadth of its dissemination. The relevant inquiry is whether Defendants marketed AdvaCal to men and women of all ages; whether or not those advertising efforts generated additional sales or revenue is inconsequential.

Lane Labs' "CompassioNet" catalogue of products also targeted women of all ages, and featured numerous advertisements for AdvaCal. (FTC's Ex. 141). Between 2003 and 2007, Defendants circulated over 7.2 million catalogues to former, existing, and prospective customers. (Stipulations of Fact ¶¶ 1-2; FTC's Ex. 392). Several advertisements throughout the catalogue describe the dangers of bone loss to women of all ages, including those in their twenties and thirties, and comments on the various advantages of AdvaCal, such as its bone building properties and high absorbability. These comments included a statement by Dr. William Lane that, "The sooner you start taking a highly absorbable calcium . . . the less likely you are to develop a problem." (FTC's Ex. 152 at 7). The wide distribution of the catalogue, and the advertisements appealing to women of all ages, indicate a marketing scheme directed at a large audience.

This scheme is also indicated by Lane Labs' website, which featured a "Dear Friend" letter touting AdvaCal's distinct bone building properties and high absorbability. (FTC's Ex. 68). Included in this Dear Friend letter is the statement, "where your system may absorb only about 20% of the calcium in a calcium carbonate supplement (or as little as 4% if your stomach acid level is low), it absorbs roughly 4 times as much of the specially processed calcium in AdvaCAL." (FTC's Ex. 68 at 2). Two paragraphs later, the Dear Friend letter states that osteoporosis is no longer just a "woman's problem," and that "men, too, suffer from this debilitating condition." (FTC's Ex. 68 at 2). In 2002, Defendants sent a near identical letter, with this same language included, to 45,000 women. (FTC's Exs. 475-478).

Defendants also extensively distributed a newsletter from the Health Sciences Institute titled "Members Alert" (the "HSI Newsletter"). (FTC's Ex. 444); Lane Labs 624 F.3d at 587. The HSI Newsletter also stresses that osteoporosis affects men and women of all ages, and discusses the

beneficial qualities of AdvaCal. (FTC's Ex. 444 at 1-3). The HSI Newsletter goes on to note that one of these beneficial qualities is AdvaCal's ability to be absorbed "*four times better* than typical calcium carbonate supplements." (FTC's Ex. 444 at 4) (emphasis in original).

While the FTC relies primarily on these marketing materials, Defendants focus their arguments on the testimony elicited during the hearing. Andrew Lane testified that AdvaCal was marketed to "Older women, postmenopausal women, primarily." (Tr. 721). Dr. Michael Hollick testified that ". . . the AdvaCal customer base that Lane Labs serves is about 60 years of age . . . ." (Defs.' Ex. 32). Jane Corcillo of Corcillo Direct, the primary advertising agency used by Lane Labse, stated that "the typical Lane Labs customer is probably an older female." (FTC's Ex. 145 at 42). While this testimony creates the impression that Defendants may have believed they were marketing primarily to older women at risk of achlorhydria, the factual evidence related to Defendants' actual advertising practices makes it clear that AdvaCal was marketed to men and women of all ages.

The Court is not swayed by Defendants' contention that the three to four times more absorbable claim was "typically linked to a discussion regarding achlorhydria." A number of Defendants' advertising and marketing material targeted large segments of the population, beyond just women who are or might be achlorhydric. These advertisements frequently included claims that AdvaCal was three to four times more absorbable than other forms of calcium. The record does not indicate that Defendants consistently, and expressly, limited the three to four times more absorbable claim to any particular segment of their market. Thus, even if AdvaCal was in fact three to four times more absorbable amongst elderly achlorhydric women, Defendants still would have promised unattainable results to large portions of their marketing audience.

Section III of the Final Order requires that Defendants possess competent and reliable scientific evidence that substantiates their claims. For the reasons stated, the Court finds that Defendants promised results that were unattainable for large portions of their audience. Therefore, Defendants did not possess competent and reliable scientific evidence to substantiate the claim that AdvaCal is three to four times more absorbable than other calcium supplements. Defendants made this claim nonetheless, and have thus violated Section III of the Final Order.

B.  Section IV

The FTC argues that Defendants made numerous express and implied misrepresentations regarding the existence, contents, validity, results, conclusion, and interpretations of tests, studies, and research in the advertising, promotion, sale, offering for sale, and distribution of AdvaCal, in violation of Section IV of the Final Order. (FTC's Proposed Findings at 15). The Court must review these alleged misrepresentations in detail, and determine whether each transgressed the proscriptions of Section IV. Lane Labs, 624 F.3d at 588.

The FTC contends that Defendants violated Section IV of the Final Order by claiming in advertisements that AdvaCal has "been clinically shown to increase bone density by as much as 10% per year." (FTC's Proposed Findings at 22). The FTC points specifically to the "per year," statement, arguing that this indicates an increase by ten percent over multiple years, and that Defendants have presented no evidence to substantiate this claim. (FTC's Proposed Findings at 22). The FTC points to the testimony of Dr. Heaney, who explained that with bone remodeling treatments such as calcium, bone density levels either flatten or decline after initial boosts in density, and that there is no evidence that AdvaCal has defied this rule. (Tr. at 352-59, 365-67). The FTC also points

to testimony by Defense expert Dr. Fujita, who described the ten percent per year claim as "questionable," noting that increases of that magnitude were "quite unlikely." (FTC's Ex. 206 at 277). With respect to this specific claim, the FTC has not carried its burden of showing a violation of Section IV of the Final Order. In making the ten percent per year claim, Andrew Lane relied on the results of a study published in two peer reviewed journals by Dr. Fujita. (Tr. at 774). The study showed one patient, out of a group of twelve, that had a twenty eight percent increase in bone mineral density at two years, and others that experienced a twenty percent increase before two years. (Tr. at 774; Defs.' Ex. 15, Ex. 9 at LANE LABS 019831-019832). While the FTC focuses on the "per year" language, the fact that the advertisement was limited by the words "as much as" is equally important. Defendants have demonstrated the existence of a study that substantiates the claim that an increase by as much as ten percent per year is possible, if not likely. Therefore, this claim did not violate Section IV of the Final Order.

Defendants did, however, violate Section IV of the Final Order by misrepresenting research, tests, and studies in graphs and charts prominently featured in AdvaCal's advertisements. One of these graphs is the "Two Year Spinal Bone Density Changes Graph," which depicts increases of bone density with AdvaCal by almost three percent for post-menopausal women, and over three percent for elderly women, in comparison to much lower, or even negative results for other treatments. (FTC's Ex. 310 D). One of the treatments AdvaCal is compared to in this graph is calcium hydroxyapatite. Andrew Lane admitted, however, that he did not possess spinal bone density changes information for this treatment, and that he used radial bone density changes information instead. The graph therefore compares spinal and radial bone density changes, but does not indicate the use of radial bone density information. Monica Reinagel, a consultant for Lane

Labs, produced a Product and Marketing Analysis for Calcium Supplements in which she discusses the dangers of combining data from different test sites. (FTC's Ex. 178 at LL 791). Ms. Reinagel states "it is important to compare 'apples to apples,'" and that the effect of calcium supplementation on bone loss or formation for different sites, such as radial and spinal, "may vary greatly." (FTC's Ex. 178 at LL 791). Therefore, by combining spinal and radial results, Defendants misrepresented the existence and validity of the studies on which the "Two Year Spinal Bone Density Changes Graph" was based.

The FTC also contends that the "Bone Density Increase with AdvaCAL" chart violated Section IV of the Final Order. (FTC's Proposed Findings at 26). This chart features bar graphs for five separate "groups." (FTC's Ex. 310 A). The first four bars purportedly depict bone density increases after twelve months, with levels of 10.6 percent for "Group 1," 7.8 percent for "Group 2," and 5.7 percent for "Group 3" and "Group 4." (FCT's Ex. 310 A). The fifth bar purportedly depicts a bone density increase of 13.5 percent after a twenty four month period for "Group 5." This chart is actually based on the "Fujix Chart," a study of bone density increases in four women, ages 69 to 96. (FTC's Ex. 33 at LL 657). In the Fujix Chart, the first four measurements are for individual women over a span of twelve months, with age 69 experiencing an increase of 10.6 percent, age 77 experiencing an increase of 7.8 percent, age 87 seeing an increase of 5.7 percent, and age 96 seeing an increase of 5.7 percent. The fifth bar represents the 96 year old woman's increase over twenty four months, with a rate of 13.5 percent. (FTC's Ex. 33 at LL 657). The FTC contends that to create the Bone Density Increase with AdvaCAL chart, Andrew Lane simply inserted "groups" in place of the results for individual women. This would create the false impression that the percentages represented are median results for a study, rather than potential outlying individual results.

Andrew Lane testified that he created these groups by combining the individual data depicted in the Fujix Chart with data from a study done on a predecessor to the AAACa calcium found in AdvaCal. (Tr. at 1239-42). The problem with this argument is that even if the "groups" were not merely individual results, the chart still gives an impression that a particular group study was done, with these exact results. There was no such study where specific groups of subjects experienced these specific results. Further, Andrew Lane did not consult with an expert to determine whether this grouping was appropriate. (Tr. at 1246-47). For this reason, the Bone Density Increase with AdvaCal chart violated Section IV of the Final Order, as it misrepresented the existence and validity of research on which it supposedly relied. Additionally, Andrew Lane testified that he combined radial and spinal data when selecting groups for this chart. (Tr. at 1242). As noted above, the effect of calcium supplementation on bone loss or formation for different sites "may vary greatly." (FTC's Ex. 178 at LL 791). Therefore, the Bone Density Increase with AdvaCal chart also violated Section IV of the Final Order for the same reason as the Two Year Spinal Bone Density Changes graph.

Section IV of the Final Order bars Defendants from misrepresenting "the existence, contents, validity, results, conclusions, or interpretations of any test, study or research." As stated above, Defendants made misrepresentations regarding the underlying data and research used to compile the Two Year Spinal Bone Density Changes graph and the Bone Density Increase with AdvaCal chart. Defendants thus violated Section IV of the Final Order.

C. Substantial Compliance

Having determined that Defendants violated Sections III and IV of the Final Order, the Court must now address the defense of substantial compliance. The Court has no doubt that Defendants

acted in good faith, and took all reasonable steps to comply with the Final Order. Good faith alone, however, does not bar a conclusion that Defendants acted in contempt. Robin Woods, 28 F.3d at 399. The Court therefore requested that the parties submit proposed findings of fact on the issue of whether the violations by Defendants were "technical" or "inadvertent," so as to entitle Defendants to the affirmative defense of substantial compliance.

    1. Relevant Case Law

To prevail on the defense of substantial compliance, an alleged contemnor must show that it "(1) has taken all reasonable steps to comply with the valid court order, and (2) has violated the order in a manner that is merely 'technical' or 'inadvertent.'" Lane Labs, 624 F.3d at 591. There is little authority within the Circuit addressing the defense of substantial compliance, and guidance on the meaning of the terms "technical" and "inadvertent" is particularly scarce. One case within the Third Circuit that did address the issue in the wake of Lane Labs is Port Drivers Fed'n 18, Inc. v. All Saints, 757 F.Supp.2d 463 (D.N.J. 2011). There, the District Court had previously enjoined the defendants from violating the conditions and requirements of the Federal Truth in Leasing Regulations, and considered whether certain violations of that injunction were merely technical, so as to justify the defense. Id. at 465. The District Court found violations in two provisions of the leasing agreement. First, the leasing agreement did not contain the language "including insurance for the protection of the public," as required by the regulations. Id. at 466-67. Second, the agreement contained a list of items that could ultimately be deducted from the lessor's compensation. The list was followed by "etc.," which violated a provision of the regulations that required the lease to "clearly specify all items." Id. at 468. The District Court noted that both violations were easily

corrected, and that the defendants had been in communication with the plaintiffs regarding compliance. Id. at 473. The District Court ultimately determined, without elaborating, that the violations could both be characterized as "technical." Id.

Two cases decided in this Circuit before Lane Labs are also instructive, as they declined to even consider permitting the defense of substantial compliance because there were numerous violations, even despite substantial efforts by the defendant. In Pub. Interest Research Group v. Top Notch Metal Finishing Co., the District Court held the defendant in civil contempt for committing forty six violations of a court order prohibiting wastewater discharge in violation of pretreatment standards contained in its permit. 1988 WL 156725 at *5 (D.N.J. Dec. 23, 1988). Despite the defendant's substantial efforts to comply with that order, the violations were simply too "numerous and serious" to justify a defense. Id. Likewise, in Haldermann v. Pennhurst State Sch. & Hospital, the District Court refused to permit the defense because the violations complained of were numerous and extensive. 154 F.R.D. 594 (E.D.Pa 1994). There, the District Court held the defendants in contempt of a court order requiring them to provide adequate care for all mentally handicapped individuals under their care. Id. The District Court would not apply the defense because the defendants had "violated nearly every substantive provision" of the order, and attempted to "conceal or minimize massive noncompliance." Id. at 608-09.

Further guidance on the meaning of the terms "technical" and "inadvertent" is found in case law from the Ninth Circuit, which applies a two part substantial compliance test analogous to the one adopted by the Third Circuit. Lane Labs, 624 F.3d at 591 (citing General Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1379 (9th Cir. 1986)).

Cases from the Ninth Circuit permitting the defense of substantial compliance seemingly

have involved violations that were either a matter of form and not substance, or were minor violations at most. For example, in Liss v. Excel Transp. Servs., Inc., the defendant "arguably complied" with a court order which required him individually to turn over a corporate computer. 2008 WL 3700886 at *4 (D. Ariz. Feb. 11, 2008). Instead of turning over the computer himself, the corporation produced "imaging" copies of the computer's hard drive. Id. Additionally, the corporation produced the imaging copies three days late under the order's terms. Id. Nevertheless, these violations were excused as a "minor technical violation" of the order. Id.

In Boink Sys., Inc. v. Las Vegas Sands Corp., the District Court ordered Boink Systems, Inc. ("Boink") to remove all images of trademarked logos from its website, but a small image depicting Boink's equipment with "THE VENETIAN" logo on the side of the machine escaped the review of its president. 2011 WL 3419438 at *2 (D. Nev. Aug. 3, 2011). Other than this single image, Boink had complied with the order. Id. The District Court found this inadvertent oversight to be an excusable "technical" violation. Id.

District Courts of the Ninth Circuit have not permitted the defense of substantial compliance, however, where contemnors violated the actual substance of a court order. On Command Video Corp. v. LodgeNet Entm't. considered violations of a court order prohibiting use of confidential information by either party to a litigation, other than in connection with the preparation of the parties' analysis of issues presented in the litigation. 976 F.Supp. 917, 920 (N.D.Cal. 1997). The District Court rejected the contention that the contemnor's use of that confidential information to file a separate state lawsuit under seal was nothing more than a "harmless technical violation." Id. at 922. The District Court reasoned that even though the separate suit was filed under seal, it was still based on the use of confidential information, and therefore consisted of exactly the type of

conduct prohibited by the court order. Id.

In FTC v. Productive Marketing, Inc., the District Court addressed violations of a court order requiring the defendants to account for certain funds. 136 F.Supp.2d 1096 (C.D.Cal. 2001). The District Court had issued a preliminary injunction order, the purpose of which was to account for and to preserve the assets of a receivership estate. Id. at 1109-1110. The contemnors failure to account for certain misdirected funds was therefore not a "harmless technical violation," despite the contemnor's assertion that the accounting was the result of "hundreds of man-hours" spent reviewing "voluminous transaction records from several sources." Id. at 1110.

This review of relevant case law does not reveal any bright line rules regarding the meaning of "technical" or "inadvertent." It does, however, provide some direction and grounds for comparison for this Court's inquiry.

2. Lane Labs' Violations

Defendants bear the burden of proving that they acted in good faith, and committed only technical or inadvertent violations. Lane Labs, 624 F.3d at 591 n.18. In arguing that any violations of the final order were inadvertent, Defendants cite to the Third Circuit's Opinion in this case for the proposition that "an inadvertent error is one that is, by its very nature, made in good faith." (Defs.' Proposed Findings at 15 (citing Lane Labs, 624 F.3d at 591 n.18)). Defendants thus argue that any violations of the Final Order were made in good faith, and therefore, were inadvertent. (Defs.' Proposed Findings at 15). In support of this argument, Defendants point to disclosures made to the FTC, substantiation for their claims, and their practice of marketing AdvaCal as an adjunct to prescription osteoporosis medications. (Defs.' Proposed Findings at 16-19). These arguments are

insufficient to support a finding of substantial compliance.

The Court remains highly concerned with the FTC's delay in bringing this suit. Defendants disclosed many of the statements at issue in 2001. The FTC's failure to act on these statements until January of 2007 is bewildering. This extensive delay understandably led Defendants to believe that they were in compliance with the Final Order, and for the FTC to bring its motion after six years seems to the Court to be fundamentally unfair. This is not, however, the relevant inquiry at this time. The issue is not Defendants' good faith attempts to comply, as while that is not in dispute, it is only half of the substantial compliance defense. Nor is the issue the FTC's laggard response to Defendants' compliance reports. Rather, the issue is whether Defendants' violations were either technical or inadvertent. Defendants cannot simply rest on their good faith efforts in answering this question, and as such, the issue of the FTC's delay is irrelevant.

Defendants' contention that they did possess substantiation for the claim that AdvaCal was unique in its ability to increase bone density is similarly irrelevant. The issue of substantiation has already been decided in this matter. Arguments that Defendants possessed substantiation for their claims, when the Third Circuit has already determined that they did not possess such substantiation, have no bearing on whether violations were technical or inadvertent.

Defendants remaining argument, that AdvaCal was marketed as an adjunct to prescription osteoporosis medications, goes more to the elements of contempt than to the defense of substantial compliance. The particular claim that Defendants aim this argument towards, that AdvaCal was comparable to prescription osteoporosis medications, appeared in the HSI Newsletter. Defendants distributed the HSI Newsletter extensively, either by direct mailings or by featuring the newsletter in retail store displays. The Third Circuit expressly stated that this claim violated Section III of the

Final Order. Lane Labs, 624 F.3d at 587. The extensive distribution of a claim that directly violated the Final Order indicates that this violation was neither technical nor inadvertent.

The defense of substantial compliance similarly does not apply to the remaining violations in this case. The claim that AdvaCal was three to four times more absorbable than other calcium supplements directly violated Section III of the Final Order. This violation was not simply caused by a delay in response or a mistake in form. Nor was the Defendants' extensive distribution of the claim the result of a simple oversight. Rather, this was a consistent, substantive violation of Section III of the Final Order, and as such, was a violation unprotected by the defense of substantial compliance. For the same reason, the claim that "only AdvaCal can increase bone density," held to violate Section III of the Final Order by the Third Circuit, is not protected by the defense of substantial compliance. This claim was widely and commonly distributed, and violated the substance of Section III. Id. at 583-84.

Defendants are also not entitled to a defense of substantial compliance for their violations of Section IV of the Final Order. Both were violations that went to the core substance of Section IV. While the violations appear to be somewhat more minor than those of Section III, they were not the result of oversight or neglect. Defendants chose to make the claims at issue, and chose to widely distribute those claims. The Court cannot find a violation under those circumstances to be either "technical" or "inadvertent."

### IV.  CONCLUSION

For the foregoing reasons, the FTC's Motion for a finding of contempt is **granted**. An appropriate Order accompanies this Opinion.

|  |  |
|---|---|
|  | S/ Dennis M. Cavanaugh |
|  | Dennis M. Cavanaugh, U.S.D.J. |

Date: November 18, 2011
Orig.: Clerk
cc: All Counsel of Record
File