# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **Hon. Dennis M. Cavanaugh** |
| Plaintiff, | **OPINION** |
| v. | Civil Action No. 2:00-cv-03174 (DMC) (JAD) |
| LANE LABS-USA, INC., CARTILAGE CONSULTANTS, INC., corporations, and I. WILLIAM LANE and ANDREW J. LANE, individuals, | |
| Defendants. | |

## DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court for a decision on the proper measurement of damages, following this Court's entry of an Opinion and Order granting Plaintiff Federal Trade Commission's ("Plaintiff" or "FTC") Motion for a Finding of Contempt (November 18, 2011, ECF Nos. 137-138). This Opinion will also address the following relevant motions filed by Plaintiff: (1) Motion in Limine to Exclude the Expert Testimony of Robert Weinberg, Linda Gilbert, and Josefina Tranfa-Abboud (November 8, 2013, ECF No. 178); and (2) Motion to Strike Exhibits H-J to the Declaration of Theodora McCormick (ECF No. 183) and all References thereto in Defendants' Supplemental Damages Brief (ECF No. 181) (December 20, 2013, ECF No. 189). Pursuant to Fed. R. Civ. P. 78, no oral argument was heard. Based on the following and for the reasons expressed herein, Defendants are ordered to pay $803,072 in damages for contempt; and Plaintiff's Motion in Limine to Exclude Expert Testimony (ECF No. 178) and Motion to Strike Exhibits and all Reference thereto (ECF No. 189) are both **denied.**

## I. BACKGROUND

This case concerns a contempt motion arising out of marketing claims about dietary supplements. Plaintiff is the Federal Trade Commission ("FTC"). Defendants are Lane Labs-USA, Inc., ("Lane Labs") and Andrew Lane (collectively, "Defendants").[1] Lane Labs, founded by Andrew Lane, is a supplier of dietary supplements. The underlying facts of this case are set forth more fully in FTC v. Lane Labs-USA, Inc., 624 F.3d 575 (3d Cir. 2010), and will not be repeated here except as required to set a foundation for the questions presently before this Court.

In June of 2000, the FTC charged Defendants with deceptive acts in violation of § 5 of the Federal Trade Commission Act (the "FTC Act"). Lane Labs, 624 F.3d at 578. During the litigation, Defendants agreed to the terms of a consent decree, which was entered by the District Court as the Final Order, imposing a permanent injunction. Id. The provisions of the Final Order relevant to this litigation are Section III and Section IV. Section III of the Final Order requires Defendants, in making claims about the health benefits of a product, to possess competent and reliable scientific evidence that substantiates their claims. Section IV of the Final Order bars Defendants from misrepresenting "the existence, contents, validity, results, conclusions, or interpretations of any test, study or research."

On January 12, 2007, the FTC filed a motion with this Court to hold the Defendants in contempt for violating Sections III and IV of the Final Order through their marketing of two products: (1) AdvaCal, a calcium supplement, and (2) Fertil Male, a male fertility supplement. FTC v. Lane Labs-USA, Inc., No. 00-3174, 2009 U.S. Dist. LEXIS 70146 at *3 (D.N.J. August 11, 2009). Following a five day evidentiary hearing, this Court denied the FTC's motion for contempt. Id. at *29. This Court based its opinion in large part on the relative credibility of the

---

[1] Dr. William Lane, originally a defendant in this action, passed away on April 29, 2011.

2

parties' expert witnesses, and on the reasonableness of the defense witnesses' approach to the subject matter in light of the Final Order's requirements. Id. at *21-25. This Court was also concerned with issues of fundamental fairness, and found that the FTC's failure to timely consider compliance reports filed by Defendants, along with facts presented at the hearing, suggested that Defendants took all reasonable steps to substantially comply with the Final Order.

On October 26, 2010, the Third Circuit reversed and remanded for reconsideration. Lane Labs, 624 F.3d at 592. Specifically, the Third Circuit held that the following claims violated the Final Order: (1) Only AdvaCal can increase Bone Density/Mass, and (2) AdvaCal works as well or better than leading prescription osteoporosis drugs and without the substantial side effects and risks. Id. at 583-4, 586-7. The Third Circuit remanded the case to this Court to reconsider whether other specific claims and actions by Defendants violated the Final Order. In an Opinion dated November 18, 2011, this Court granted FTC's motion for a finding of contempt and held that (1) the claim that AdvaCal is three to four times more absorbable than other calcium supplements violated Section III of the Final Order; (2) Defendants' Two Year Spinal Bone Density Changes Graph violated Section IV of the Final Order; and (3) Defendants' Bone Density Increase with AdvaCal Chart also violated Section IV of the Final Order. FTC v. Lane Labs-USA, Inc., No. 00-3174, 2011 U.S. Dist. LEXIS 133144 (D.N.J. November 18, 2011).

The primary issue presently before this Court is the amount of damages to award Plaintiff based on the Court's finding of contempt. The parties initially briefed the damages issue in early 2012. However, the Court found these submissions insufficient for rendering a complete decision and ordered a second round of briefing. (Order, July 19, 2012, ECF No. 153). In that Opinion, the Court made it clear that it maintained "significant discretion" in determining how to compensate consumers for Defendants' violations and was not constrained, as argued by the FTC,

3

to award $15,050,581, the amount of Defendants' total AdvaCal revenues during the relevant period. Id. at 2. The Court suggested other possible remedies it would consider, including an award of the premium Defendants charged for the product over comparable products during the relevant time period as well as Defendants' profits traced to only the offending advertisements. Id. at 2-3. The Court requested sufficient data to support these potential remedies and also noted that the FTC's proposed award of gross revenues could still prove to be the only appropriate remedy. Id. The Court also expressed concern that a massive damages award would force Defendants into bankruptcy and would act more as a penalty on Defendants than a compensation to consumers. Id. at 3. The Court then asked the parties to suggest safeguards that could be implemented to prevent such a result and requested that the FTC demonstrate the manner in which it planned to distribute damages. Id. at 3-4.

In this Opinion, the Court will also address two related motions filed by the FTC. On November 8, 2013, the FTC filed a Motion in Limine to Exclude the Expert Testimony of Robert Weinberg, Linda Gilbert, and Josefina Tranfa-Abboud. (ECF No. 178). Plaintiff argues that the opinions expressed by Defendants' experts do not meet the standards of Federal Rules of Evidence 702 and 703 and are therefore inadmissible. On December 20, 2013, the FTC filed an additional Motion to Strike Exhibits H-J to the Declaration of Theodora McCormick (ECF No. 183) and all references thereto in Defendants' Supplemental Memorandum on Damages (ECF No. 181). (ECF No. 189). Plaintiff asserts that these exhibits, which consist of three academic journal articles, are inadmissible hearsay under Fed. R. Evid. 801.

II. **MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF ROBERT WEINBERG, LINDA GILBERT, AND JOSEFINA TRANFA-ABBOUD**

a. **The Standard for the Admissibility of Expert Testimony**

"Rule 702 has three major requirements: (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Id.* at 244. The second factor contains a "reliability" component and requires that the "reasoning or methodology underlying the testimony is scientifically valid and [that] the reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592-93 (1993). Reliability is a question of sufficiency, not absolutism. See Poust v. Huntleigh Healthcare, 998 F. Supp. 478, 491 (D.N.J. 1998). In other words, an opinion is reliable if the expert has "good grounds for his opinions . . . ." Id.; see also In re Jacoby Airplane Crash Litig., 2007 U.S. Dist. LEXIS 71012, at *41 (D.N.J. Aug. 27, 2007) ("[A]n expert's testimony need not be flawless for it to be reliable and admissible.").

Rule 703 states that the expert may base his opinion on "facts or data" that he or she "has been made aware of or personally observed" so long as they are of the type that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject." "Rule 703's reliability standard is similar to Rule 702's reliability requirement," and only calls for expert testimony to be excluded "when the data underlying the expert's opinion are so unreliable that no reasonable expert could base an opinion on them . . . ." In re TMI Litig., 193 F.3d 613, 697 (3d Cir. 1999) (citing In re Paoli R.R. Yard Pcb Litig., 35 F.3d 717, 748 (3d Cir. 1994)).

**b. Discussion**

To support their proposed damages calculations, Defendants provided declarations from three experts. Robert Weinberg ("Weinberg") is an independent consultant in direct and database marketing with decades of experience in market research. Weinberg Decl. ¶¶ 1, 8-9, ECF No. 164. Weinberg was retained by Defendants to estimate the likely additional retail sales

5

that could be attributed to the offending claims and charts. Linda Gilbert ("Gilbert") is a recognized expert in consumer marketing and market research with 30 years of experience, including specific experience in consumer research regarding calcium products. Gilbert Decl. ¶ 2, ECF No. 163. Gilbert was retained by Defendants to determine (1) AdvaCal's "Competitive Set" from the consumer point of view and (2) the percentage of dissatisfied AdvaCal purchasers. Dr. Josefina Tranfa-Abboud ("Tranfa-Abboud") is a Director in the Litigation and Corporation Financial Advisory Services Group of Marks, Paenth & Shron, LLP, an accounting and consulting firm that provides audit services, economic damages analysis, and other financial and analytical services. Tranfa-Abboud Decl. ¶ 1, ECF No. 162. Tranfa-Abboud was retained to calculate potential damages using a price premium analysis and, alternatively, profits tied to the offending advertisements. Id. at ¶ 11.

Plaintiff asserts that these experts provide opinions about damages that do not meet the standards of Federal Rules of Evidence 702 and 703. Specifically, Plaintiff asserts that Weinberg's opinions lack a sufficient evidentiary basis because they 1) are based on incorrect factual data "spoonfed" to him by Defendants that Weinberg failed to independently verify and 2) incorrectly ignore sales tied to the AdvaCal label. As to Gilbert, Plaintiff attacks the satisfaction survey she conducted for having an overly restrictive sample and low response rate. Plaintiff also asserts that consumers cannot gauge their own bone loss and are therefore incapable of answering the fundamental question asked by the survey: Did AdvaCal perform as advertised. Plaintiff also challenges the Competitive Set compiled by Gilbert for failing to include cheaper mass-market competitors of AdvaCal. Finally, Plaintiff argues that Tranfa-Abboud's estimated damages are unreliable because she relied entirely on Weinberg, Gilbert, and Defendants' flawed data. Plaintiff does not challenge the qualifications or expertise of

Defendants' experts. Plaintiff has not conducted any independent analysis of Defendants' sales or financial records and has not presented any competing expert testimony from its own financial or marketing experts.

Under Fed. R. Evid. 702, a judge acts as "gatekeeper" in determining the reliability, relevance and admissibility of expert testimony. Daubert, 509 U.S. at 597. Where, as in the instant matter, the Court, not a jury, is the trier of fact, that gate keeping function is relaxed. Warner Chilcott Labs. Ir., Ltd. v. Impax Labs., Inc., 2012 U.S. Dist. LEXIS 60386, at *69-70 (D.N.J. Apr. 30, 2012) (citation omitted); see also Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 596 n. 10 (D.N.J. 2002), aff'd, 68 F. App'x 356 (3d Cir. 2003). In addition, motions seeking to bar expert testimony may be denied on the ground that the movant's arguments are more appropriately considered attacks on the weight to be given such evidence, as opposed to its baseline admissibility. See Howmedica Osteonics Corp. v. Zimmer, Inc., 2013 U.S. Dist. LEXIS 132889, at *3 (D.N.J. Sept. 16, 2013) ("Here, Defendants' arguments are better suited for the weight of the evidence rather than its admissibility under Daubert."). Given this more lenient standard, the Court finds that it would be appropriate to consider Plaintiff's arguments when determining the weight to be given this testimony in its damages analysis rather than its admissibility altogether. Accordingly, Plaintiff's Motion in Limine to Exclude the Expert Testimony of Weinberg, Gilbert, and Tranfa-Abboud is **denied**.

### III. MOTION TO STRIKE EXHIBITS H-J OF THE DECLARATION OF THEODORA MCCORMICK AND ALL REFERNCES THERETO

The dissatisfaction survey orchestrated by Defendants' expert Gilbert asked AdvaCal consumers whether the product performed as advertised. Plaintiff asserts that AdvaCal purchasers would be unable to accurately gauge whether the product led to an increase in bone density as claimed. Defendants counter that consumers could intelligently address the survey

question about product performance by referring to their personal bone density scans or experience with fractures. To support this contention, Defendants introduced three academic journal articles[2] (exhibits H-J of the Declaration of Theodora McCormick) to demonstrate that AdvaCal consumers commonly have access to bone density scans and are aware of their bone health. Plaintiff has moved to strike these articles and all references to them in Defendants' brief as inadmissible hearsay under Fed. R. Evid. 801. As will be clear in the Court's Damages analysis, the Court did not consider or rely on Defendants' dissatisfaction survey in making its damages determination. As such, Plaintiff's Motion to Strike Exhibits H-J of the Declaration of Theodora McCormick is **dismissed** as moot.

### IV. DAMAGES ANALYSIS AND AWARD

#### a. Standard

A District Court has "great and sound discretion in fashioning an appropriate sanction for contempt." Robin Woods, Inc. v. Woods, 28 F.3d 396, 399 (3d Cir. 1994). See also Delaware Valley Citizens' Council for Clean Air v. Pennsylvania, 678 F.2d 470, 478 (3d Cir. 1982) ("The standard for our review of a district court sanction for civil contempt is whether the district court abused its wide discretion in fashioning a remedy."). One defined limitation to the Court's wide discretion is that compensatory sanctions "must not exceed the actual loss suffered by the party that was wronged." Elkin v. Fauver, 969 F.2d 48, 52 (3d Cir. 1992), cert. denied, 121 L. Ed. 2d 379, 113 S. Ct. 473 (1992) (citing U.S. v. United Mine Workers, 330 U.S. 258, 303). "While good faith is not a defense to civil contempt, it may affect the court's calculation of sanctions."

---

2 The three articles are: 1) J. Foote, et al., *Factors Associated with Dietary Supplement Use Among Healthy Adults of Five Ethnicities: The Multiethnic Cohort Study*, 157 American Journal of Epidemiology 888 (2003); Di Shi, et al., *Associations of Education Level and Bone Density Tests among Cognitively Intact Elderly White Women in Managed Medicare,* Current Gerontology and Geriatrics Research, Volume 2012 (2012), Article ID 179150; R.L. Prentice, et al., *Health Risks and Benefits from Calcium and Vitamin D Supplementation: Women's Health Initiative Clinical Trial and Cohort Study*, 24 Osteoporosis International 567 (2013).

8

Essex County Jail Inmates et al., v. Treffinger, et al., 18 F. Supp. 2d 445, 452 (D.N.J. 1998) (citing Robin Woods, Inc., 28 F.3d at 148). Further, in determining the extent of the sanction, a party's intent and willfulness are relevant. Bunzl Distribution Northeast v. Boren, 2008 U.S. Dist. LEXIS 43, at * 15 (D.N.J. January 2, 2008) (citing Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 148-49 (3d Cir. 1994)).

### b. Discussion

The Court has found Defendants in civil contempt for violation of a prior court order. Specifically, the Court found that Defendants, in advertising the product AdvaCal, presented three unsubstantiated claims and two misrepresentative graphs to consumers. The Court must now determine the appropriate amount of damages to award as a result of this violation, making sure not to "exceed the actual loss suffered by the party that was wronged." Elkin, 969 F.2d at 52. Despite the Court's request for both parties to consider alternate remedies, Plaintiff has only presented arguments in favor of an award of total net AdvaCal revenues for the relevant time period ($15,050,578) and against all of Defendants' proposed alternatives. Plaintiff bases its position on the proposition that such an award is the only amount that would provide the FTC with "full remedial relief" for the violation on behalf of consumers. See McComb v. Jacksonville Paper Co., 336 U.S. 187, 193 (1949) ("The measure of the court's power in civil contempt proceedings is determined by the requirements of *full remedial relief*") (emphasis added). However, Plaintiff never makes clear precisely why this extreme calculation is the appropriate measure of "full remedial relief" as opposed to Defendants alternative approaches which appear to the Court to be more tailored to the actual violation and take precaution not to "exceed the actual loss suffered by the party that was wronged." Elkin, 969 F.2d at 52.

In determining the damage measurement in this case, the Court has considered the

following: (1) Defendants' good faith as demonstrated by the significant efforts taken to comply with the Final Order; (2) the accumulation of unnecessary consumer loss and potential damages resulting from Plaintiff's over five-year delay in informing Defendants of any issues with their advertisements; (3) the fact that imposing sanctions of the magnitude requested by the FTC would bankrupt Lane Labs and Andrew Lane; (4) testimony from the FTC's own expert, Dr. Robert Heaney, that AdvaCal was a good form of calcium which would be expected to substantially reduce the risk of bone fractures (Tr. 412-13, 426-27); and (5) testimony from another of FTC's experts, Kenneth Kelly, that "the consumer injury will be the difference between what consumers paid for AdvaCal and its true value," or "what they would have had to pay for a competing equivalent product." McCormick Decl. Exh. B, Kelly Expert Report at ¶¶ 6,12. As the Third Circuit opined in National Drying Machinery, Co. v. Ackoff:

> Whether an award in civil contempt be measured in terms of a plaintiff's loss or a defendant's profit, such an award, by very definition, must be an attempt to compensate plaintiff for the amount he is out-of-pocket or for what defendant by his wrong may be said to have diverted from the plaintiff or gained at plaintiff's expense. Unless this limitation is recognized, a requirement that one party turn his profits over to his adversary itself becomes a punitive rather than a compensatory imposition.

245 F.2d 192, 194 (3d Cir. 1957), cert denied, 355 U.S. 832 (1957). Given this standard and the above-mentioned facts, the Court finds it would be inappropriate to award an overtly punitive damage amount like the one suggested by Plaintiff.

As the Third Circuit makes clear in Elkin and National Drying Machinery Co., the primary goal in fashioning a damage remedy for civil contempt is to calculate the loss suffered by the wronged party. Here, those wronged by Defendants' violation are the consumers who relied on the offending advertising claims in purchasing AdvaCal. Therefore, the most appropriate measure of relief is one that is tied to sales from the offending claims. Although AdvaCal did not live up to those unsubstantiated and misrepresentative claims presented by

10

Defendants, it was still an effective calcium supplement, as was conceded to by the FTC's own Expert, Dr. Robert Heaney. See Tr. 412-13, 426-27. Given that consumers received a valid product, the Court finds that awarding all revenues during the relevant period, as suggested by the FTC, would dramatically overstate the consumers' loss. See McDowell v. Philadelphia Housing Authority, 423 F.3d 240 (3d Cir. 2005) ("The sanction imposed on a civil contemnor may not exceed the actual damages caused by his violation of the Court's order."). A more accurate calculation of the harm suffered is the price premium paid by consumers in selecting AdvaCal over other calcium products.

### c. Damages Calculation

#### i. Direct Sales Revenues – Defendants' Data and Tracing Analysis

To determine compensatory damages based on a price premium approach, Defendants first calculated the total amount of "Consumer Direct Sales Revenues" from AdvaCal attributed to the offending advertisements. This total is estimated to be $2,568,994. Tranfa-Abboud Decl. 6 ¶ 11(b). Plaintiff challenges the integrity of Defendants' underlying data and recordkeeping. Specifically, Plaintiff asserts that Defendants improperly relied on an incomplete system of key codes to track sales and arbitrarily excluded sales from numerous purchasers.

Essentially, the FTC is attempting to impose an evidentiary standard of 100% certainty on Defendants without any legal support for doing so. The FTC's criticisms of Defendants' tracing analysis are also unsupported by any expert analysis or opinion and ignore evidence in the record regarding the reliability, accuracy and completeness of the data and methodology used. For instance, Andrew Lane and Beatrice Querel, the manager of Lane Labs' in-house customer service/telephone sales representatives, were familiar with the ads and had the expertise to do the tracing analysis. McCormick Decl. Ex. C (Lane Dep. 15:11-16:9) and Ex. B

11

(Querel Dep. 31:20-32:1). Both testified as to their extensive efforts to ensure that they were capturing all sales related to offending ads, using not only source/key codes but telephone numbers, special offers and other indications that a sale might be tied to an offending ad. McCormick Decl. Ex. B (Querel Dep. 44:6-46:16; 51:10-53:24; 57:6-58:9; 61:0-62:8) and Ex. C (Lane Dep. 21:5-25:8). Where necessary, they reached out to Research and Response, Inc., a direct response data management company, to obtain information that might lead to more offending sales. Id. Both Lane and Querel testified that the consumer-direct sales for every offending ad between 2001 and 2006 were identified and included in the tracing analysis. McCormick Decl. Ex. B (Querel Dep. 38:25-39:13; 43:2-43:5; 44:6-45:7; 53:6-53:24; 57:15-57:17; 68:15-69:3) and Ex. C (Lane Dep. 24:18-25:8; 28:18-28:20; 33:24-34:17). Further, Weinberg, a direct sales and marketing expert with 40 years of experience noted that "steps taken by Lane Labs to capture and record the source codes of buyers placing an order with the company equal or exceed industry best practices." Weinberg Decl. 7, ECF No. 164. Based on the extensive support presented by Defendants in defense of their calculations, the Court finds that Defendants' sales data and tracing methodology are sufficiently reliable.

### ii. Retail Revenues – Weinberg Analysis

Next, Defendants estimate the total "Retail Revenues" attributed to the offending ads to be $1,336,997. Tranfa-Abboud Decl. 6 ¶ 11(c). This is based on Weinberg's estimate that the additional sales at retail would be equal to 50% of the tracked direct sales as well as a calculation that two additional brochures would have yielded an additional $52,500 in retail sales ($1,284,497(50% of direct sales) + $52,500(sales from 2 brochures) = $1,336,997). Weinberg Decl. 9 ¶ 11. Weinberg is an independent consultant in direct and database marketing with decades of research experience. Essentially, Plaintiff's issue with Weinberg's testimony is that it

12

is based on allegedly faulty data "spoonfed" to him by Lane Labs without any independent verification. The Court has already addressed Defendant's data and held that it is sufficiently reliable for purposes of its damages analysis. Since the FTC does not challenge Weinberg's qualifications or expertise or the methodology used to calculate the percentage of retail sales traceable to the offending ads, the Court finds no reason not to accept Weinberg's 50% retail sales estimate. The Court thus finds that the total consumer direct and retail sales from the offending ads is $3,905,991 ($2,568,994(direct sales) + $1,336,997(retail sales).

### iii. Price Premium – Gilbert's Competitive Set

In order to establish the price premium between AdvaCal and other comparable products, Gilbert, Defendants' expert, determined AdvaCal's "Competitive Set." Gilbert, a recognized expert in consumer marketing and market research with 30 years of experience, including specific experience in consumer research regarding calcium products, engaged in a series of analytical exercises and research to determine which products consumers would reasonably be expected to say "belong together." This yielded a Competitive Set of 16 products. Gilbert then compared the prices of these products and determined that AdvaCal was priced 1.26 times higher than comparable calcium products. Plaintiff's primary issue with Gilbert's Competitive Set is that it ignores much cheaper, mass-market calcium supplements. Plaintiff asserts Gilbert "blindly relied on data spoonfed to her by Defendants that only included high-end calcium products." Pl. Expert Br. 31.

However, as Defendants explain, the lists of potential calcium products used by Gilbert were from both Lane Labs' and the FTC's prior experts. Defs.' Expert Br. 23. In addition, even though AdvaCal is not marketed in mass market channels, the lists did include such products, including Tums, Rite Aid Calcium and Nature's Bounty. Gilbert Decl. Ex. 5. Moreover, several

potential calcium products in the list that were priced higher than AdvaCal did not make it into the Competitive Set. Given these facts, the Court finds that Gilbert's Competitive Set is based upon sound reasoning and reliable evidence. As such, the Court will use Gilbert's Competitive Set analysis in its price premium damages calculation.

### iv. Price Premium Damages Calculation – Tranfa-Abboud Analysis

Using data from Gilbert's Competitive Set, Tranfa-Abboud determined that the ratio of the average price of comparable products to the average price of a daily dose of AdvaCal is 20.56%. Tranfa-Abboud Decl. 8-9, ¶ 14. Tranfa-Abboud thus concluded that had AdvaCal been sold at the same average price as its comparable calcium products, the revenues to Lane Labs resulting from sales to Advacal would have been approximately 20.56% lower than actual AdvaCal sales revenues. Id. at ¶ 15. Applying this percentage to the total AdvaCal revenues from offending ads ($3,905,991 x 20.56%), Tranfa-Abboud determined that the damages resulting from the "premium" charged for AdvaCal would be approximately $803,072.

The FTC argues that "Tranfa-Abboud's estimated damages are unreliable because she relied entirely on Weinberg, Gilbert, and Defendants' flawed data." FTC Expert Br. 17. As the Court has determined, Defendants' sales data and tracing methodology are sufficiently reliable and Weinberg and Gilbert's opinions are sound and based upon reliable facts. Accordingly, the Court accepts Tranfa-Abboud's damages calculations and holds that Defendants' must pay $803,072 in damages for violating a prior court order and being found in civil contempt.

### v. Distribution of Damages

As for the distribution of damages, Defendants are to pay the entire damages amount to the Court Registry. The funds may then be withdrawn by the FTC with leave from the Court. Defendants are to provide a mailing list of customers who purchased AdvaCal directly from

Lane Labs as a result of an offending ad. Plaintiff and Defendants are to work cooperatively to provide notice to consumers about the refund and to ensure that as many customers are refunded as possible. Defendants are to bear the costs of the notification and reimbursement process.

V.    **CONCLUSION**

For the foregoing reasons, Defendants are ordered to pay $803,072 in damages for civil contempt; and Plaintiff's Motion in Limine to Exclude Expert Testimony (ECF No. 178) and Motion to Strike Exhibits and all Reference thereto (ECF No. 189) are both **denied.**

Dennis M. Cavanaugh, U.S.D.J.

Date:       January 17, 2014
Original:   Clerk's Office
cc:         Hon. Joseph A. Dickson, U.S.M.J.
            All Counsel of Record
            File